UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA            :
                                    :   REPORT AND
            -against-               :   RECOMMENDATION
                                    :
MOUTAZ ALI,                         :   05-CR-785 (NG)
                                    :
            Defendant.              :
                                    :
------------------------------------------------------------x

GOLD, S., U.S.M.J.:

## INTRODUCTION

Defendant Moutaz Ali is charged in this case with possessing steroids with the intent to distribute them. The steroids were seized during a search of Ali's apartment. Ali has moved to suppress the steroids and other physical evidence seized from his apartment and statements he made after their seizure.

The Honorable Nina Gershon has referred defendant's motion to me for a report and recommendation. Docket Entry 21. I conducted a hearing on defendant's motion on February 2 and 3, 2006. At the hearing, the government presented the testimony of agents Rafael Alamo, Russell Hott, Karen Oates and Bryant Wong. In the defendant's case, Ali testified, as did Ibrahim Foda. The government and the defendant have submitted post-hearing letters dated February 9 and February 23, 2006, respectively. For the reasons stated below, I respectfully recommend that defendant's motion to suppress be granted in its entirety.

## FACTS

On August 18, 2005 at approximately 6:00 a.m., four Immigration and Customs Enforcement ("ICE") Deportation Officers went to the apartment of Moutaz Ali in Astoria, New York in search of a removable alien. Tr. 10. The officers, Rafael Alamo, Russell Hott, Karen

Oates and Michael Kidd, had received information from a confidential source that the alien, Mohammed Ragab Hassan, had been seen driving a van registered to Ali at the Astoria address. Tr. 29. Alamo testified that the officers also believed that Hassan was associated with a business that used Ali's address. Tr. 28-29, 31. The information that Hassan had been seen driving Ali's van was at least one month old and the information concerning the business connection was at least a year old. Tr. 29, 31. Finally, Agent Hott testified that information from the United States Postal Service indicated that Hassan was receiving mail at Ali's address. Tr. 88. Before going to Ali's apartment, the officers canvassed the neighborhood for the van that Hassan had been seen driving but did not find it. Tr. 34-35, 134.

Ali lives on the second floor of a three-story building. Tr. 76, 145. His apartment is small, with an entrance foyer, living room, kitchen, bathroom, bedroom and office. Gov't Ex. 7; Def. Ex. AG. The only closet in the apartment is to the left of the entrance foyer. Tr. 213. The apartment has a fire escape off of the window in the office. Tr. 51, 211.

The officers gained entry to the apartment building either by buzzing a tenant on the first floor or with the assistance of a relative of the building's owner who happened to be working there when the officers arrived. Tr. 11, 38, 77-78. Although Alamo and Hott do not recall checking the name on the mailbox and buzzer, they believe they did so and that Hassan was not listed. Tr. 41-42, 88. See also Affidavit in Support of Search Warrant, Gov't Ex. 3500-BW-9, ¶ 2 (indicating that the buzzer and mailbox read "Ali Al Hasari" and "Ahmed"). The first-floor tenant recognized Hassan from a photograph as someone he had seen visiting Ali's apartment, but also specifically told the officers that Hassan did not live there. Tr. 12, 39-40, 78-79, 88.

At some point between 6:00 and 6:30 a.m., the officers proceeded to the second floor and

Officer Alamo knocked on Ali's apartment door. Tr. 13, 79. The officers were wearing bulletproof vests and ICE raid jackets and had guns and batons with them. Tr. 12, 35-36, 111. Ali answered the door wearing a towel or blanket wrapped around his waist. Tr. 13, 43, 79, 190. Hott testified that Ali appeared to be groggy and that he was still recovering from recent eye surgery. Tr. 81. Alamo identified himself and his fellow officers as police conducting an investigation, asked Ali if they could enter, and, according to Alamo, obtained Ali's consent to come into the apartment. Tr. 14, 44, 80. Although Hott did not recall whether Ali gave verbal permission to enter, he testified that Ali opened the door wider and extended his arm when Alamo asked permission to enter. Tr. 80-81, 112, 136. Agent Oates did not recall whether Alamo asked for consent or whether Ali granted the officers permission to enter. Tr. 146. Ali testified that he did not give the officers permission to enter and that they pushed past him into the apartment. Tr. 191, 199, 217-18.

Once inside the apartment, the officers surrounded Ali in the entrance foyer. Tr. 82-83, 115. From the foyer, the officers could see all the rooms in the apartment. Tr. 15, 85. Alamo and Hott testified that one of the first things they noticed in the apartment was a basket full of money, including several fifty dollar bills, on a table near the kitchen where they were standing. Tr. 17, 82; Gov't Ex. 5.

The officers initially interviewed Ali briefly in the foyer, after which Alamo and Kidd continued to question Ali in the office. Tr. 53, 84. At some point during the questioning, Alamo suggested that Ali might be more comfortable if he were dressed. Kidd then accompanied Ali into the bedroom to get some clothes. Tr. 53, 55, 84-85. From where Hott was standing, he observed Kidd in the bedroom watching Ali. Tr. 85, 115. Ali, however, testified that he keeps

3

his clothes in his office and that he did not go into the bedroom to get clothes. Tr. 192, 212.

While Kidd and Alamo interviewed Ali in the office regarding the whereabouts of Hassan, Hott conducted a security sweep, entering the other rooms in the apartment. Tr. 85-86. Hott testified that he conducted the sweep to ensure there were no other people or readily-accessible weapons in the apartment. Tr. 85-86, 88. Oates stayed in the living room. Tr. 148. Upon entering Ali's bedroom, Hott observed that the top drawer of the dresser was open approximately three inches. Tr. 88, 93-94. Hott testified that he looked inside the drawer to ensure there were no easily accessible weapons there. Tr. 91, 94-95. Inside the drawer he observed a hypodermic needle and several ampules or vials. Tr. 90, 96. Hott then noticed ampules on top of the dresser as well. Tr. 90, 96-97. But see Report of Investigation, Def. Mem., Ex. A (describing the discovery of the steroids in the paper bag and dresser drawer but containing no indication that steroids were found on top of the dresser) and Affidavit in Support of Search Warrant, Gov't Ex. 3500-BW-9, ¶ 5 (same). Additionally, after going further into the bedroom, Hott observed a large brown paper bag on the bedroom floor between the dresser and the wall. Tr. 92, 96-98. Hott looked inside the paper bag and saw clear plastic bags containing hundreds of ampules of steroids. Tr. 97, 100. Ali testified that all of the dresser drawers were closed and that there was a bed sheet covering the top of the paper bag with the steroids in it. Tr. 209, 211-12, 226.[1]

---

[1] Alamo's recollection of the sequence of events surrounding the discovery of the drugs differs from Hott's account in some respects. Where there are inconsistencies, I credit Hott's testimony for purposes of my decision, both because Alamo was far more tentative in his recollection, see Tr. 69, and because Alamo did not participate in or witness the discovery of the steroids in the bedroom. There are also inconsistencies between the accounts of the officers, including Hott, and Ali. Because as discussed below I recommend that Ali's motion to suppress be granted even assuming the truth of Hott's testimony, I do not make credibility findings or

The officers questioned Ali about the drugs and Ali admitted they were steroids.  Tr. 198-99.  Kidd then contacted the officers' supervisor, Bryan Banks, who arrived at Ali's home later with three other ICE Deportation officers.  Tr. 59, 99, 151.  At some point after Banks' arrival, Ali was handcuffed and moved to a reclining chair in the living room for additional questioning.  Tr. 102-03.  The officers asked Ali if there were any readily-accessible weapons in the room and Ali informed them of a scuba knife behind the chair.  Tr. 128-29.

At around 9:00 a.m., ICE Special Agent Bryant Wong arrived at Ali's home, accompanied by a detective from the Queen's County District Attorney's Office.  Tr. 161, 167.  Wong uncuffed Ali and presented him with consent-to-search and Miranda forms.  Tr. 107, 167.  Wong asked Ali to consent to a search of his apartment, but Ali refused.  Tr. 168; Gov't Ex. 3500-BW-5.  Wong told Ali he was under arrest and read Ali his Miranda rights.  Tr. 168.  Ali signed the Miranda form, waived his rights and agreed to speak to Wong.  Tr. 169; Gov't Ex. 3500-BW-11.  Ali had not been given any Miranda warnings prior to Wong's arrival.  Tr. 61-62, 178, 200.  Ali admitted to Wong that the steroids were his and told Wong how he had obtained the drugs.  Tr. 171.  See also Affidavit in Support of Search Warrant, Gov't Ex. 3500-BW-9, ¶ 5.  Ali alleges, however, that Wong questioned him about the drugs before he was given his Miranda warnings.  Tr. 204-05.

Ali was placed under arrest.  The officers then obtained a search warrant based on Ali's statements and the items they had already seized.  Tr. 174-75; Gov't Ex. 3500-BW-3; Gov't Ex. 3500-BW-9.  The cash from the living room, the needle and the ampules from the drawer and the ampules inside the paper bag were all seized.  See Report of Investigation, Def. Mem., Ex. A.  In

---

otherwise attempt to resolve these inconsistencies.

the course of executing the warrant, the officers found and seized an additional $23,040 in cash, additional steroid ampules, six computers and various documents. Tr. 175-76.

**DISCUSSION**

Ali moves to suppress all of the seized physical evidence and the statements he made after the steroids were discovered. Ali first asserts that he did not give the officers his consent to enter his home. Ali also argues that, even if the officers were lawfully present in his home, they were not justified in conducting a protective sweep of his apartment. Ali further contends that the sweep Hott conducted exceeded the permissible scope of a protective sweep as authorized in Maryland v. Buie. 494 U.S. 325, 110 S. Ct. 1093 (1990). Lastly, Ali argues that the statements he made and the additional evidence found in his apartment pursuant to the search warrant must be suppressed as fruits of an illegal search and seizure.

A.  Consent to Search

Warrantless searches of a home are per se unreasonable and prohibited by the Fourth Amendment. However, entry and search of a home with properly obtained consent is reasonable and does not violate the Constitution. See Florida v. Jimeno, 500 U.S. 248, 250-51, 111 S. Ct. 1801, 1803 (1991). Thus, law enforcement officers may properly enter and search an apartment if they have the resident's permission to do so. See id.; U.S. v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995).

According to the officers' testimony, they asked for and received consent to enter Ali's apartment. Tr. 14, 44, 80-81, 112, 136. Ali testified that he did not give the officers consent, either verbally or otherwise. Tr. 191, 199, 217-18. I do not resolve this factual dispute because I find, for the reasons discussed below, that the protective sweep conducted by Hott was unlawful

even if the agents had Ali's consent to enter his apartment.

B.  Protective Sweep

When officers enter a home pursuant to an arrest warrant, they may, under certain circumstances, conduct a protective sweep of the home without first obtaining a search warrant. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." Maryland v. Buie, 494 U.S. 325, 327, 110 S.Ct. 1093, 1094 (1990).

The general term protective sweep is used here to describe three types of limited, warrantless searches arguably applicable to the facts of this case. The first, typically referred to as a "search incident to arrest," permits law enforcement officers to conduct "a search of the arrestee's person and the area 'within his immediate control'–construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." Chimel v. California, 395 U.S. 762, 763, 89 S.Ct. 2034, 2040 (1969).

Officer Hott, apparently believing his search of Ali's bedroom was justified as a "search incident to arrest," testified that he searched the bedroom, at least in part, to make certain that there were no readily accessible weapons inside. Tr. 86, 95. However, Hott's search was not a proper search incident to arrest for at least two reasons. First, Ali had not yet been placed under arrest – and there was no probable cause to support an arrest – when Hott conducted his search of the bedroom. Second, Ali was in the office, and the interior of the bedroom was not "'within his immediate control.'" Chimel, 395 U.S. at 763, 89 S.Ct. at 2040. "There is no . . . justification . . . for routinely searching any room other than that in which an arrest occurs. . . ." Id.

The other two types of protective sweeps which might arguably apply here were described

7

in Buie. 494 U.S. at 334, 110 S.Ct. at 1098. The first type of Buie sweep, also sometimes referred to as a search incident to arrest, authorizes law enforcement officers, "as a cautionary matter and without probable cause or reasonable suspicion, [to] look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. Hott's search of Ali's bedroom cannot be justified as a protective sweep to prevent an attack for the same reasons it does not meet the criteria for a weapons search under Chimel. First, a protective sweep of this type, conducted without probable cause or reasonable suspicion, is justified only when a suspect is being placed under arrest. Buie, 494 U.S. at 334, 110 S.Ct. at 1098; see also U.S. v. Moran Vargas, 376 F.3d 112, 115 (2d Cir. 2004) (rejecting the government's claim that a suspicionless search was proper under Buie because "there was no arrest prior to the search"). Second, the bedroom searched by Hott was not a "space immediately adjoining" the office where Alamo and Kidd were questioning Ali. Although Ali's apartment is small, it has five rooms, with a kitchen and bathroom separating the office from the bedroom.

For these reasons, the government's reliance on U.S. v. Lauter, 57 F.3d 212 (2d Cir. 1995), is misplaced. In Lauter, officers seized a firearm and ammunition during a protective sweep of Lauter's small two-room apartment. Lauter moved to suppress, arguing among other things that the sweep conducted by the officers was impermissibly broad. The district court denied the motion to suppress and the Court of Appeals affirmed. However, unlike Ali, Lauter was being arrested as the protective sweep of his apartment was underway. Moreover, Lauter's apartment had only two small rooms, with only a bed in one and nothing but a doorway to a basement in the other. 57 F.3d at 213. The Lauter court concluded that the room with the bed was "immediately adjoining" the room with the doorway, and that a suspicionless protective

8

sweep of both rooms was therefore proper. Id. at 217. Because Ali's apartment is significantly larger than the one where Lauter lived, and because Ali was not under arrest at the time of the protective sweep, the holding in Lauter does not apply here.

The final type of protective sweep authorizes law enforcement officers to conduct a more comprehensive sweep, including looking in other rooms in a residence. To justify a broader Buie sweep, however, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the . . . scene." Buie, 494 U.S. at 334, 110 S.Ct. at 1098. The Court emphasized that a sweep is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." Id. at 335, 110 S.Ct. at 1099. Moreover, the Second Circuit has held that "generalizations, without more, are insufficient to justify a protective sweep." Moran Vargas, 376 F.3d at 116.

Hott's search of Ali's bedroom did not meet the requirements for this final, broader type of protective sweep. There are several reasons why this is so.

First, it is not clear that a broad protective sweep may ever be conducted when officers enter a residence not to execute a warrant but after obtaining the occupant's consent in the course of an ordinary investigation. Buie involved officers who were lawfully present in a defendant's home for purposes of executing an arrest warrant. Several courts have since considered whether Buie should be applied in contexts other than the execution of a warrant, and have extended Buie to authorize protective sweeps in situations where the police are lawfully on the premises, although not pursuant to an arrest warrant. See, e.g., U.S. v. Martins, 413 F.3d 139, 150 (1st Cir. 2005) (allowing protective sweep after lawful entry based on exigent circumstances); U.S. v.

9

Gould, 364 F.3d 578, 584 (5th Cir. 2004) (en banc) (holding that arrest is not a required element to justify a protective sweep and finding that protective sweep after consent entry was permissible under the circumstances); U.S. v. Taylor, 248 F.3d 506, 513 (6th Cir. 2001) (allowing a Buie protective sweep where an officer was left behind to secure premises while a search warrant was obtained).

The Second Circuit recently extended Buie to allow a protective sweep after law enforcement officers entered a home to assist an occupant with a protective order. U.S. v. Miller, 430 F.3d 93 (2005). The Court held that officers "present in a home under lawful process," such as an order directing them to enter a premises to protect an individual, may conduct a protective sweep so long as they have "articulable facts" to suggest that a dangerous individual may be present. Id. at 95, 98, citing Buie, 494 U.S. at 334, 110 S.Ct. at 1098.

However, the Second Circuit has yet to decide whether protective sweeps following consent entry are reasonable and constitutional under Buie. See U.S. v. Gandia, 424 F.3d 255, 262 (2d Cir. 2005). In Gandia, the Court specifically cautioned that "when police have gained access to a suspect's home through his or her consent, there is a concern that generously construing Buie will enable and encourage officers to obtain that consent as a pretext for conducting a warrantless search of the home." 424 F.3d at 262. See also Moran Vargas, 376 F.3d at 114-15 (acknowledging conflicting circuit court authority but finding it unnecessary to decide whether an arrest is a necessary element of a Buie protective sweep); Gould, 364 F.3d at 589-90 (recognizing some of the problems presented when protective sweeps are conducted after a consent entry but nevertheless finding a sweep after consent entry permissible under the circumstances).

Even assuming that a broad protective sweep under Buie may be conducted when officers obtain consent to enter a residence, Hott's search of Ali's bedroom would be improper because the officers lacked any basis to believe that the bedroom "harbor[ed] an individual posing a danger." Buie, 494 U.S. at 334, 110 S.Ct. at 1098. First, no specific articulable facts suggested that Hassan or another individual was present in the apartment. Both Ali and the first-floor tenant told the officers that Hassan did not live in the apartment. Tr. 40, 79, 88, 193. The mailbox and buzzer contained no indication that Hassan lived there. Tr. 41-42, 88. Although the officers looked in the neighborhood for the van Hassan had been seen driving, they were unable to locate it. Tr. 34-35, 134. Additionally, when the officers first entered, they could see into all of the rooms of the apartment and did not see any evidence that anyone else lived in the apartment or was present at the time. Tr. 85, 126. Finally, it was unlikely that Hassan or anyone else was visiting at six o'clock in the morning. Ali's lack of dress also suggested that no one else was present. In short, the testimony adduced at the hearing failed to establish any reason to believe that anyone else was in the apartment, and there was thus no justification for conducting a broad protective sweep. See U.S. v. Rudaj, 390 F. Supp. 2d 395, 401 (S.D.N.Y. 2005) (finding "no such articulable facts" where agents were told no one else was present and the agents made no observations suggesting anyone else was in the premises); U.S. v. Romy, 1997 WL 1048901, at *9-*11 (E.D.N.Y. Apr. 24, 1997) ("Lack of information [suggesting that another individual was present] cannot provide an articulable basis upon which to justify a protective sweep."). Cf. U.S. v. Medina, 301 F. Supp. 2d 322, 332-33 (S.D.N.Y. 2004) (upholding a broad protective sweep of an apartment where there was the "possibility" of someone else present because the arrestees told the police the apartment was not theirs).

Indeed, the events Hott described during his testimony make it extremely difficult to believe that Hott had any reason to think someone dangerous might be lurking in the bedroom. Before Hott conducted his search, Kidd had already entered the bedroom with Ali to get some clothes.[2] Tr. 85. Ali's bedroom is approximately 10 feet long and 8 feet wide and has no closets. Tr. 114, 213; Def. Mem. 3-4. The only furniture in the room is a bed and a dresser. Tr. 166. The bed sits on a wooden platform, and it is easy to see that a person could not hide under it. Tr. 121. In light of the small size of the room, it must have been obvious to Hott that anyone hiding there would already have been seen by Kidd.

Even if the officers suspected that Hassan or someone else might be present, they had no basis to believe that the individual was dangerous. As noted above, before conducting the second type of Buie protective sweep, law enforcement officers must reasonably believe "that the area to be swept harbors an individual *posing a danger*." Buie, 494 U.S. at 334, 110 S.Ct. at 1093 (emphasis added). However, the officers' actions upon first entering the apartment suggest that they sensed no reason to be concerned for their safety. After the officers entered and began to question Ali in the entrance foyer, no one conducted a sweep of the closet immediately next to where they were standing. Tr. 19-20. None of the officers checked the fire escape or quickly looked into the other rooms. Tr. 118. Finally, no one conducted a protective sweep of the office before or as Alamo and Kidd entered it to question Ali. Tr. 126.

The government proffers the theory that the agents believed that Ali was harboring a

---

[2] Ali testified that he never entered the bedroom. Tr. 192. I need not resolve this discrepancy in the testimony. Whether Ali entered the bedroom with Kidd or not, Hott's search was unlawful. Moreover, if Ali's testimony is accurate, the agents never had consent to enter his apartment in the first place, and his motion to suppress would be granted on that basis.

12

dangerous fugitive. Gov't Post-Hearing Supp. Brief at 2-3. The government grounds its argument that the officers reasonably believed Hassan posed a danger based on his "past efforts to evade capture." Id.; Tr. 237-38. No details of any escape attempt were presented at the hearing. Nor is there any logical basis for concluding that an illegal alien who is attempting to evade capture is, as a result, likely to "launch an attack" on law enforcement officers from a hiding place.

Finally, Hott had no reason to venture far enough into the bedroom to see inside the dresser drawer or the paper bag. A protective sweep "may extend only to a cursory inspection of those spaces where a person may be found." Buie, 494 U.S. at 335, 110 S.Ct. at 1099. The evidence presented at the hearing included a diagram and photographs of Ali's apartment and suggests that Hott could see that no one was in the bedroom by observing the room from the doorway. Although Hott stated that he needed to enter the room to determine whether someone might be hiding in the space between Ali's dresser and the bedroom wall, Tr. 121-23, the photographs and other evidence make it clear that this space was too small to conceal a person from view, even from the vantage point available from the doorway. The contents of the drawer and the paper bag, on the other hand, could be observed only after entering the bedroom. Tr. 120. Thus, even assuming a protective sweep was otherwise justified, because Hott could eliminate the possibility that someone was lurking in the bedroom by looking into the room from the doorway, he had no right to enter the room as part of his "cursory inspection of those spaces where a person might be found."

For these reasons, I conclude that the officers did not reasonably suspect that a dangerous individual was present in Ali's apartment and that Hott's search of Ali's bedroom was not a

proper protective sweep. Because Hott was not lawfully present in Ali's bedroom, the evidence he discovered there must be suppressed.

C. Statements

Ali argues that his statements to the officers while they were in his apartment should be suppressed as "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 484-88, 83 S.Ct. 407, 416-17 (1963). See also Brown v. Illinois, 422 U.S. 590, 604-05, 95 S.Ct. 2254, 2262 (1975) (holding that custodial statements following an illegal arrest were not admissible despite the fact that the defendant had been given Miranda warnings). The government conceded at the hearing that if the search of Ali's bedroom was unlawful, his subsequent statements would be inadmissible fruits. Tr. 232-33. Because I conclude that the search was illegal, the statements Ali made after Hott discovered the steroids in his bedroom must also be suppressed.

Ali argues in the alternative that his statements were made after he was in custody and before he received the warnings required by Miranda. Because I find that all of Ali's statements must be suppressed as the fruits of an illegal search, I do not reach this issue.

## CONCLUSION

For all of these reasons, I respectfully recommend that defendant's motion to suppress be granted.

Any objections to the recommendations made in this Report must be filed with the Clerk of the Court and the Chambers of the Honorable Nina Gershon within ten days of receiving this Report and Recommendation and, in any event, on or before March 24, 2006. Failure to file timely objections may waive the right to appeal the District Court's Order. See 28 U.S.C. § 636(b)(1); FED. R. CRIM. P. 59(b); Small v. Secretary of Health & Human Servs., 892 F.2d 15,

16 (2d Cir. 1989).

                                                  /s/
                                    Steven M. Gold
                                    United States Magistrate Judge

March 7, 2006
Brooklyn, New York

*U:\eoc 2004-2006\ali\ali final.wpd*